## ROBERTS *v.* PEAVEY *& a.*

Selectmen may order repairs to be made in mills, dams, &c., where the property is owned by joint tenants, or tenants in common, but they must be co-tenants not merely of the mills, dams, &c., but of the use of them.

If the co-tenants of a water mill and dam lose the right to use the water, the selectmen can no longer order repairs to be made.

If one of the co-tenants of the property is disabled to use the property, because he has no right to flow the land required for the use of the mill, he is no longer to be regarded as a tenant in common, within the meaning of the statute relating to repairs of mills.

A mill was occupied for several years, the dam of which was eight feet high, and the owners paid damages for flowing the land, which was injured by the flowage, when the water was raised above six feet. The dam was washed away. One of the owners purchased the land so flowed. It was *held*, that selectmen had no power to order repairs to be made at the expense of the owners, in proportion to their shares in the mill. And that the owner who had no right to raise the water above six feet could not be charged equally with those who could flow eight feet.

IN EQUITY. The bill sets forth, that in 1816, Samuel Jones owned land in Farmington, through which the Cochecho river flowed. In that year he and others jointly put in operation a saw mill, called the Jones mill, and built a dam which flowed a part of this land, and much land of others. Part of Jones' land was used for a mill yard. The mill was divided into twenty-four equal parts or days. The land of Daniel Watson was flowed and injured by the dam without his consent. In 1820, Watson claimed damages, and recovered, by the award of arbitrators, damages then incurred at the rate of twelve dollars a year. He never gave permission to the mill owners to flow his land; but he claimed and was paid damages at that rate until he sold the land.

The interest of Samuel Jones in the mill, mill dam, mill yard, and mill privileges, passed to the plaintiff, Roberts, in June, 1846, with the land upon the river.

January 1, 1845, Watson conveyed to Paul Peavey, one of the defendants, part of the land overflowed by this dam,

after which Peavey claimed damages of the plaintiff and other mill owners, for flowing his land, and brought suits against the plaintiff and Joseph Jones therefor, and they settled the actions and paid ten dollars damages and sixty dollars costs.

April 23, 1849, Watson leased to Peavey another part of the land overflowed by the mill dam for 999 years, with a right to Peavey to flow the water above the banks of the river as high as the dam at the Jones mill, of its then height, to wit, eight feet one inch at the westerly corner post of the mill above the ledge, at a rent of seven dollars per annum, and the water to be drawn off from June 15 to September 15, yearly, Peavey to have right to terminate the lease on six months' notice.

Peavey then demanded of the plaintiff damages for his share of the mill, at the rate of twenty-four dollars a year for the whole damage done to the Watson land. But the plaintiff has never voluntarily paid him any damages.

In June, 1850, Peavey prevented the plaintiff from using the mill when his turn came, and drew off the water.

In the spring of 1852, most of the dam was destroyed by a freshet, and the dam rendered useless.

On the 19th of June, 1852, Paul Peavey and the other defendants applied, by petition, to the selectmen of Farmington, setting forth that they are each owners in common, to wit, Paul Peavey of $\frac{20}{48}$ths, P. W. Horn of $\frac{8}{48}$ths, J. Roberts of $\frac{2}{48}$ths, and J. L. Roberts of $\frac{2}{48}$ths of a saw mill, with the dam, flume and privileges in Farmington, on Cochecho river, known as the Jones mill; the other $\frac{18}{48}$ths thereof are owned by Jeremiah Roberts, (the plaintiff:) the mill, dam and flume are much out of repair, a large part of the dam being swept away by a freshet in April last, and the mill thereafter useless. Repairs are necessary immediately, and said Jeremiah Roberts has been requested to make his part of them and has refused. They pray that a hearing may be appointed, said Roberts notified, and that

said selectmen would order said Roberts to make his proportionate part of said repairs necessary for said mill, dam and flume, in such manner and time as they judge reasonable, and to pay his just part of the costs, &c.

The selectmen appointed a time and place of hearing, notified the petitioners and the plaintiff, and on the 20th of July, 1852, after a full hearing, made their order, as follows :

Upon the foregoing petition, the subscribers, selectmen, &c., having notified, &c., and heard the parties on the 9th and 20th of July, 1852, and their evidence, and examined, &c., are of opinion that the mill, &c., are owned as stated in the petition ; that all the tenants in common but Jeremiah Roberts are desirous that the premises should be repaired ; that the following repairs are necessary, (stating them,) and Jeremiah Roberts has neglected to make the same.

We therefore order that $\frac{9}{24}$ths of all said repairs be made by said Jeremiah Roberts within forty days from the date, in a good substantial manner, and that he pay $18,71, being two-thirds of the costs of said petition and hearing, to Peavey and the other petitioners.

July 21, 1852. (Signed by the selectmen.)

If the dam should be rebuilt and the mill repaired, no head or fall can be obtained at said mill by means of a dam sufficient to operate and use said mill for the purpose of sawing, to be of any profit, value or advantage, without overflowing the Watson land ; and that the privilege of the water, without which the mill cannot be operated, is not owned jointly or in common by the persons named in said petition in proportion to their respective shares named therein, but that said Peavey owns in severalty and wholly controls the same.

If the dam should be rebuilt, the plaintiff's meadow would be flowed, and he lose the use of it ; and he must expend several hundred dollars, from which he can receive no benefit

without subjecting himself to be sued by Peavey for flowage.

The bill prays an answer, an injunction to restrain the defendants from rebuilding the dam and repairing the mill according to said order, or otherwise, and for general relief.

By the defendants' joint and several answer they admit S. Jones' ownership of land in Farmington, upon Cochecho river, the building of the Jones' saw mill and dam, and the flowing caused by it, the use of S. Jones' land for a mill yard, and that the mill was divided into twenty-four equal parts or days.

They say the mill owners purchased the mill yard, much of the land flowed, and the right to flow the rest, (except Watson's land,) at an expense of $440, and they and the succeeding owners have owned and claimed and adversely occupied the mill, mill dam, mill yard and lands flowed, and the right of flowing the lands, except Watson's.

They admit the flowing of Watson's land, and his demanding and recovering and receiving damages as alleged, and that he gave no right to flow other than may be legally inferred from the facts stated in the bill.

They say the occupants of the mill have annually drawn off the water about the first of June, and kept it off till about the first of September, and were bound to do so, and with this exception the owners have kept up the mill and dam till the dam was carried away, as stated in the bill.

They substantially admit the plaintiff's title to the land and share in the mill owned by S. Jones.

They say that John Roberts, Joseph Jones, jr., J. G. Watson, and Samuel Jones, owing in severalty the mill in unequal shares, and the lands flowed by the dam, and Samuel Jones owning the mill yard, in order to make the lands the property of themselves, as mill owners in common, in proportion to the shares they owned in the mill, on the 17th of February, 1820, all and each mutually, in the presence of two witnesses, who attested the same, signed, sealed, exe-

cuted, acknowledged and delivered an agreement, (annexed to the answer,) whereby, reciting that they are owners of a saw mill in F. called the Jones mill, and each has land flowed by said mill dam, they agree to refer the appraisal of the land flowed, with a plat round the mill spotted out, as a privilege to lay lumber, to be appraised according to quantity and quality, to three referees, binding themselves in $100 to abide the award, &c., adding, it is understood that the land to be appraised shall be considered as the property of the owners in proportion to the share which each owns in the saw mill.

The appraisers accepted and executed the trust, and reported, March 7, 1820, their appraisal of the lands of each signer, by the acre, by writing, under their hands, and the signers agreed, in writing, on the back of the report, to abide by it. The said writings being annexed to the answer.

They say they believe that soon after this appraisal the quantity of land taken for the mill yard and flowed by the dam was ascertained, and the amount due to each, agreeably to said appraisal, was found to be, to J. Jones, jr. $50,62, to Samuel Jones, $38,60, to J. G. Watson, $116, and to John Roberts, $13,22, and these sums were paid and accounted for to and with each by the mill owners, in proportion to their respective shares in the mill; and all other lands and rights of flowage purchased on account of said mill owners, were paid and accounted for by said mill owners in the same proportion, whether the conveyances were made to all or to some of them, in trust for all, and they have ever since been owned by the original mill owners and their assigns in those proportions.

Peavey says, and the others believe, that D. Watson conveyed part of the land flowed, to Peavey, as alleged in the bill, and that afterward Peavey claimed and recovered damages, by suit, as stated in the bill, and that Watson leased the rest of the land flowed, to him, as stated in the bill, and Peavey demanded $24 a year for the whole damage to said

Watson land, of the plaintiff and the other owners, in proportion to their shares; and that the plaintiff has at several times voluntarily paid Peavey money on account of those damages, for each of which Peavey gave a receipt.

That on or about June 1, 1850, Peavey, according to invariable custom since the mill was built, drew off the water, but has never otherwise prevented the plaintiff from using the mill when it was his turn.

That Peavey, soon after April 23, 1849, when Watson made to him said lease, offered to the mill owners the right of flowing the Watson land for their proportions of $24 a year for the whole annual damage, and they agreed to pay and continued to occupy and flow till the summer of 1850. In that summer the dam was decayed, and they agreed to have it rebuilt, and each to pay his proportion of the expense.

September 21, 1850, and before the agreement to rebuild the dam, and as an inducement to enter into that contract, it was agreed by Peavey and the plaintiff that they should enter into indentures of lease, whereby the plaintiff should have for 999 years the right to flow the Watson land as one of the mill owners, paying annually $9 a year to Peavey, and an indenture was prepared, examined by the plaintiff, and declared to be right, and he desired another copy made, and he and Peavey agreed to execute, deliver and receive the same the next Monday morning. The other part was prepared, and Peavey was ready and offered to execute his part, and still is and always has been ready and willing to execute and deliver the same to the plaintiff, but the same have never been executed by either party.

The defendants say that on the 21st of September, 1850, the plaintiff and Peavey, in behalf of said mill owners, but in their own names, contracted, in writing, with one Titcomb to build a stone dam at said mill, who accordingly built the same, and they paid him therefor the sum of $475, and the other owners reimbursed them for their shares.

The mill, &c., was used and occupied by the plaintiff and defendants as tenants in common from the completion of said stone dam, in the fall of 1850, till it was carried away in April, 1852, or nearly so.

They admit the petition to the selectmen, the notice, hearing and order, as set forth in the bill.

They say that all the privileges of water that now belong or ever belonged to said mill, &c., are now owned in common by said persons named in said petition, in proportion to their respective shares named therein; that Peavey does not own any part of the privilege of the water belonging to said mill in severalty, nor does he as the owner of the Watson land own in severalty, or otherwise, any part of the privilege of the water belonging to said mill.

They say that should said dam be rebuilt, no meadow land belonging to the plaintiff would be overflowed by the water raised by said dam, nor would any land but the Watson land be overflowed, which the mill owners, as such, have not the right to overflow; nor would the plaintiff be thereby deprived of the use of any land which he has a right to use.

And that if the plaintiff will comply with the order of said selectmen, and with his agreement with said Peavey, as to the lease of the Watson land as he ought, he may and can receive his due proportion of benefit from such expenditure, and can use and improve said mill his part of the time without any liability to an action by said Peavey.

The defendants say the plaintiff has, during last summer, completed and put in operation a saw mill of his own within one hundred rods, and they believe he refuses to execute said indentures and to repair the Jones mill to prevent its being used, and to increase the business at his mill.

The defendants, or some of them, at the hearing before the selectmen, offered to buy and pay $25 a share for his shares in the Jones mill, but he refused to sell, and said he would not sell at any rate.

Horn and J. L. Roberts assert their respective rights to $\frac{2}{48}$ths each of the Jones mill.

The defendants say they claim they have a right to have said dam rebuilt, and said mill repaired according to the order of the selectmen, though the privilege of the water is not owned jointly or in common by those who claim to own said mill, &c., in proportion to their interest therein.

They deny that the other defendants act under Peavey's influence, for his benefit, or with expectation of advantage from him.

They say many logs are at the Jones mill which will be damaged unless the injunction is removed.

Peavey says, and the others believe, that he bought ten shares in said mill of Joseph Jones for $275, upon the express condition that he and those who may claim under him shall maintain a saw mill at that place, and in default thereof the deed shall be inoperative.

The defendants deny all combination, &c.

Exception was taken to the answer, and the defendants submitting to it, say, that according to their best information, should said dam be rebuilt and saw mill repaired, a head and fall can be obtained at said mill, by means of said dam, sufficient to operate said mill for the purpose of sawing, so as to be of good and much profit, value and advantage, without causing the water to overflow said Watson land, as in said bill alleged, or any part of it, and without injuring it, or any part of it.

Sworn to September 15, 1852, and December 20, 1852.

To this answer a general replication was filed, and evidence was taken, the effect of which will sufficiently appear in the arguments and opinion of the court.

*Hobbs*, for the plaintiff.

The order of the selectmen is a nullity.

At common law no action can be maintained by one tenant in common or joint tenant against another, for repairs

of mills, except on writ of *reparatione facienda.* F. N. B. 195 (127) ; *Carver* v. *Miller,* 4 Mass. Rep. 559 ; Co. Litt. 200, b. ; 4 Kent 366. To render a party liable for repairs, he must be a tenant in common of the whole property sought to be repaired. *Knox* v. *Silloway,* 10 Maine Rep. 201, (1 Shepley,) and cases cited. A tenant in common, from the very nature of the estate, must necessarily have a right to the whole property.

The common law is the law here, unless altered by statute. *Cochecho Railroad* v. *Farrington,* 6 Foster's Rep. 425. There is no dispute that these parties were tenants in common. The statute of June 16th, 1801, § 1, applying to joint tenants or tenants in common, did not alter the common law rights, but it extended the remedy to cases where the mill dams or flumes had been divided, but the privilege of the water remained to them as joint tenants or tenants in common. N. H. Laws, (ed. 1830) 186.

The principles of the common law were in no way altered by this act, except in the case last stated. The remedy alone was altered. At the passage of this act there was no court, vested with equity jurisdiction, in this State. Where such tribunals exist, the proper remedy between joint tenants or tenants in common against each other was in equity. A new tribunal, of limited jurisdiction, was provided for this case, and its powers extended to the case where the dam was divided, but the water remained in common ; but this new tribunal was still governed by the principles of the common law.

The powers of the selectmen are controlled by the common law. A tenant in common had no power to alter the common property. If repairs could not be made without such alteration, none could be made. It has been decided here, in the case of *Bellows* v. *Dewey,* 9 N. H. Rep. 278, that the statute of 1801 does not authorize one tenant in common, under the order of the selectmen, to call on his cotenant to erect a new mill or dam, substantially different

from the former one, or to be driven by a new or different motive power.

Could, then, these mills be repaired without alteration? Had the plaintiff here such a common interest in the entire mills and privilege, that he could enjoy this mill privilege, as such, without alterations, without encroaching on the rights of Peavey? We allege it cannot be so used without encroachment. If it cannot, we say the selectmen had no authority. The evidence as to this is contradictory to some extent. The witnesses are scientific men, but they disagree. It is admitted that the mill, as it was always used, did overflow the Watson land. The usage continued for many years. Damages were claimed and paid by the mill owners, Peavey among the rest, though he now says it was not necessary to flow that land. We think this was a practical settlement of the question, that there was no right of flowage, and that it was necessary so to flow, in order to an advantageous and beneficial use of the mill, or to any practical use whatever.

We contend that the balance of the testimony of the witnesses, both the scientific and the practical men, is, that sufficient head cannot be obtained without flowing this land properly to operate a mill. A mill there might be useful to some extent, for some purposes, but not to be of value as it has been used. The statute is to have a common sense construction. It is not enough that it would not be wholly useless.

The theory of the defendants' witnesses is, that a valuable privilege may be made at this site, by blasting the ledge under the wheel, deepening the channel, &c., but they are not authorized to add or essentially alter the old mill, and the selectmen have no authority to order material alterations without consent.

*Christie & Kingman*, for the defendants.

Our rights rest on the Revised Statutes, ch. 135. This is no alteration, but merely a revision of the statute of

Roberts *v.* Peavey.

1801.  The old statute is explicit.  Our rights are beyond the common law.  We stand on the statute.  It is admitted we are tenants in common, that we have owned and used this property as tenants in common nearly forty years. The only question is, if the selectmen have exceeded their jurisdiction.  They constitute a tribunal exercising judicial authority.  This court, as a court of equity, has no control over them.  A *certiorari* lies in this court, but in an equitable proceeding the court has no jurisdiction over them.  The only court which has jurisdiction to control inferior tribunals, is this court, under its common law powers.  As a court of equity, it has no such control, and cannot interfere with the judgment of any other court.  In cases of fraud or unconscionable advantage, the court may interfere, or where the party has no power to protect himself, and in no other instances.

The selectmen have exercised their jurisdiction properly, and after a patient hearing, and if so, we contend the bill ought to be dismissed.  If they kept within their jurisdiction, this court has no right to interfere.

We say they had such jurisdiction, because these parties were tenants in common of the whole property in question. Whatever rights they have heretofore had or exercised, in relation to this property, have been in common.  They own the mill and dam together, and the right to flow all the land below the Watson bridge, and the right to flow the Watson land, under a verbal lease.  Peavey has interfered with none of the rights they have heretofore had as to the Watson land.  The dam is eight feet one inch high.  Above the point where it flows the Watson land, the rights have been hired, but hired in common, and the rent paid in common. What are our rights, if they are not those of tenants in common ?  It is said Peavey raised the rent—true ; but Roberts agreed to the raised rent ; he agreed to execute a lease at that rent, and then built the dam.  Can he now complain ? They are tenants in common of the right to flow.

We contend it is not necessary for the owners of the mill to have any interest in the water, any water or any water privilege. Suppose parties build a mill, to be operated by horses or by steam, does not this statute reach that case? Is it confined to a water mill? The mill is what they are to own together. The fact that they have the water together or not, makes no difference. If it is a mill, it comes under the statute. If they are tenants in common, both of the mill and privilege, the plaintiff has no equity. We say they have been such for forty years. All their rights in the mill and privilege have been used in common. They may be tenants in common of a leasehold as well as of a fee.

We contend here was a good privilege, without flowing the Watson land. It is a clear rule, that answers responsive to the bill are to be regarded as true, unless contradicted by two witnesses. Our answer is explicit. We think the evidence does not overcome the answer. The plaintiff's witnesses admit a head and fall of six feet and four inches, if the channel was cleared out and restored, and we think six feet and four inches sufficient to carry a good mill.

As to the equity of the case, why should our property be taken from us? We lose all but $\frac{9}{24}$ths of the property. We cannot call on Roberts to pay for any repairs we make, so it can be no loss to him. If the mill is not repaired, he and we both lose. Where is his ground of complaint? He is not to pay unless he choose. We hold the mill till we are paid.

He will neither use his own property, nor allow us to use ours.

The property is not valueless. He was offered $25 or $30, at the hearing, for each of his shares, and refused it.

Two years ago he urged us to build a new dam, and then agreed to accept a lease of the flowage. In justice, he ought now to be the holder of such lease, and the objection now made would be gone. If he will not do equity, he ought not to be heard when he asks it of us. We are subjected

to great loss by his refusal to do his duty, and we ought not to be debarred from the exercise of our just rights, either to promote his interests or to gratify his temper.

As to the jurisdiction over the court below, they cited *State* v. *Thompson*, 2 N. H. Rep. 237; *Huse* v. *Grimes*, 2 N. H. Rep. 210; *Hopkinton* v. *Smith*, 15 N. H. Rep. 154; *Commonwealth* v. *B. H. Turnpike*, 5 Mass. Rep. 420; *Parks* v. *Boston*, 8 Pick. 218; *Dow* v. *True*, 1 App. 46; *Rex* v. *Uttoxeter*, 2 Stra. 932; 3 Dan. Ch. Pr. 1840, 1845.

*Hobbs*, in reply.

It is said the jurisdiction of the selectmen is given by statute, and this court has no control over them; but we contend that this court has, in chancery cases, all the jurisdiction of courts of equity elsewhere, to set aside judgments of other courts, where it is unjust or inequitable that the party should take advantage of them, and in cases where inferior courts have exceeded their jurisdiction. That is the present case; the jurisdiction of the selectmen is special; where the privilege of the water is not owned in common, they have no power. The statute has no application to the case supposed, of horses or steam power. There is no such matter before the court as offering to take a lease, as an inducement to build the dam. Answers, not responsive to the bill, are not evidence.

BELL, J. The facts alleged in the bill and in the answer are admitted or proved, with the exception of the allegation of the bill, "that if the dam should be rebuilt and the mill repaired, no head or fall can be obtained at said mill, by means of a dam sufficient to operate and use said mill for the purpose of sawing, to be of any profit, value or advantage, without overflowing the land conveyed or leased by Watson to Peavey, or greatly injuring the same, or some part of it."

This is distinctly denied in the answer, and the evidence

is in conflict in regard to it. It is not deemed necessary or profitable to recapitulate the evidence on this subject. We think the difference in the testimony of the witnesses is rather apparent than real, and that it may be reconciled without questioning either the fairness, scientific skill or intelligence of any of the witnesses. The conclusion which we draw from all their statements, giving to the answer its due weight, is that by deepening the stream for some thousand feet below the mill, and by blasting at the mill so as to increase the head and fall, by placing the wheel and its apron a foot and half or two feet lower, a pretty good privilege may be made there. But we regard this as a fact of no consequence in this case, since the privilege which might thus be made would be a new privilege, essentially different from that now owned by the parties; and we suppose it clear, that whatever the parties may agree to do among themselves, the powers of selectmen do not extend so far as to enable them to prescribe any thing beyond substantial repairs, a point to which we may revert again.

It is not suggested that the owners of the mill have any right to interfere with the stream below, further than to restore it to its original state. Supposing, however, that no substantial change is to be made in the character or construction of the mill, but the whole should be restored to its condition before the freshet, which carried away the dam, occurred, the dam rebuilt, the floom, wheel, race, and other works repaired, the wall in the river between the main stream and the raceway replaced and the raceway cleared out, as it was in the best condition in which it was kept by the mill owners, at any time after the mill was built, the result of the whole evidence, taken with the answer, we think, is to show that there would be, at the Jones mill, a privilege which could be used for the purpose of sawing, without flowing or injuring the Watson land, with a head and fall barely sufficient to drive the mill, and capable of affording a small profit, but falling short of the power here-

tofore used at the mill, by from two to three feet in the head of water, according to the varying testimony of the witnesses. If we suppose it to be the least of these measures, it must make an essential difference in the character and value of the mill, a difference so great that a person might well be anxious to own a share of the more rapid and powerful mill, who would be entirely disinclined to invest his money in a mill of the slower and more feeble power, which could never afford more than the lowest grade of profit.

Upon this state of facts, several questions arise, and first, it is said that the selectmen, in cases of this kind, are a judicial tribunal, and exercise powers of a judicial character; and as such are not subject to the control of this court, sitting as a court of equity, and exercising their powers in a proceeding purely equitable.

We think both these positions are true. Where power is conferred upon one or more persons, upon an application made by one party for any kind of redress for wrongs committed or rights withheld, or duties unperformed by another, to cite such other to appear before them, and are then authorized to hear such parties and their evidence, and to pronounce a decision, and to make any decree or order in relation to their rights or duties, their decision is in its nature judicial, and all their proceedings in regard to it are judicial. *Sanborn* v. *Fellows*, 2 Foster's Rep. 489. *The State* v. *Richmond*, 6 Foster's Rep. 232. Such, we think, beyond question, are the proceedings of selectmen in relation to the repairing of mills.

This court has all the powers, when regarded as a court of law, of the highest common law tribunals in England, in regard to all inferior tribunals. *Cochecho Railroad* v. *Farrington*, 6 Foster's Rep. 428. But its powers as a court of equity, that is, in cases commenced and prosecuted according to the course of proceedings in equity, do not extend beyond those usually exercised by courts of equity elsewhere. The court, as a court of equity, does not assume

to exercise any control or corrective jurisdiction over inferior tribunals. Its powers of that kind are exercised only according to the course of the common law. But all courts, whether of high or low jurisdiction, whether legal or equitable, possess the common right to inquire into the validity of the proceedings of all other tribunals, of whatever grade, whether domestic or foreign; not the right to rejudge their judgments, or to retry the cases they have decided; but to inquire whether they have acted, in the course of their proceedings, within the legitimate scope of their jurisdiction, because their proceedings are invalid, if their jurisdiction does not reach them. When cases, elsewhere decided, are brought incidentally in question, they are neither revised nor reversed as to their merits; but if they are properly authorized, they are regarded as absolutely conclusive, if rendered within our jurisdiction, or in tribunals entitled to the like credit with our own, or as presumptive evidence, if rendered elsewhere, or, if unauthorized, they are merely disregarded or rejected.

This court, in the present case, may well inquire, if the selectmen had jurisdiction to make the order against which the plaintiff asks relief. And as their jurisdiction is very closely confined, both as to the cases and persons and modes of proceedings, there can few questions arise except such as are in their nature objections to the jurisdiction. No objections are suggested here to the manner of the proceedings. But the questions whether this property is such that the statute applies to it, or the interest of the parties in it is such that the process lies in their case, or the order such as the selectmen could rightfully make, are all open to inquiry here, as necessarily involving the powers of the tribunal.

Courts of chancery have a very broad jurisdiction over the persons of parties, in cases where judgments have been rendered by courts of competent authority, and which are in themselves neither erroneous or reversible, on grounds entirely collateral to the merits of those judgments. It may

be entirely inequitable and unjust for a party to avail himself of such a judgment on other grounds; and it is a familiar practice in these courts to enjoin a party from insisting upon or enforcing a judgment which it is unjust and inequitable for him to take advantage of. It is admitted, indeed, in the defendants' argument, that the court may interfere in cases where the party is justly chargeable with fraud, or is attempting to take an unconscionable advantage.

The questions involved in this case, as to the order of the selectmen, seem to us clearly open to investigation on both of these grounds, if the positions taken by the plaintiff are sustainable, or if the objections which appear on the bill are well founded.

The principal question presented by the case relates to the jurisdiction of the selectmen, which depends upon the construction of chapter 135 of the Revised Statutes. By the first section of this chapter, it is provided that " all necessary repairs in any mill, mill dam or flume, owned by joint tenants or tenants in common, or in any mill dam or flume, owned in severalty, when the privilege of the water is owned jointly or in common, shall be made by such owners in proportion to their respective interests therein."

By the statute of 1801, of which this chapter is a revision, " all necessary repairs in any mill, mill dam or flume, owned by joint tenants or tenants in common, shall hereafter be made by such tenants, each contributing thereto in proportion to his interest therein ;" and the statute then provides, as in the Revised Statutes, for an application to the selectmen, a notice and hearing, and an order by them, prescribing the repairs to be made, and by whom and in what proportions. At the close of the section, it is provided that " where the mill dam or flumes have been divided, and are held in severalty, and the owners thereof shall be joint tenants or tenants in common, of the privilege of the water, and the owner or owners of any particular part of such mill

dam or flume shall suffer his part thereof to go out of repair, any one of the other owners may apply to the selectmen in like manner, and the selectmen shall proceed in the same way to notify the parties as herein directed, where mills, mill dams or flumes are owned by joint tenants or tenants in common." By the Revised Statutes, the provisions relating to the two cases contemplated by the statute are united, but we see no indications that there was any intention materially to change the construction of the statute.

Under the first section of this chapter of the Revised Statutes, the question arises whether joint tenants or tenants in common of mills or mill dams have any rights under this statute, where they have not the ownership of the water power necessary to operate their mills, or, in other words, where they have no legal right to obstruct the natural flow of the water, for the purpose of raising the necessary head of water to drive their mills.

Such a state of facts may be supposed to occur from various causes. The most natural and frequent of these would be the expiration of the contracts or leases under which rights of flowage have been obtained, and the refusal of the owners of the property injured to permit the flowage to be continued. In such a case, however perfect and complete in themselves such mills and their machinery may be, their value as such, in that place, has ceased, and, we think, that with the loss of their moving power, that is, of the privilege of the water to carry them, they lose their character as mills and mill dams, and the statute relative to the repairs of mills, has no longer any application to them, and they stand on the ordinary ground of joint and common property, which the parties may rebuild or repair, as they think proper.

It is contended, in the argument for the defendants, that the statute reaches the case of all kinds of mills, whether they are carried by wind or steam or by water, and that it applies with equal force and propriety to the case where

they were driven by horses or by hand, and that it is wholly immaterial as to the manner in which the driving force is owned or obtained; that if parties own a mill in common, as, for example, a cider mill, and the agreement is that each owner shall supply his own horse, when he has occasion to use the mill, it is a case clearly within the provisions of the statute.

It is not necessary to decide, at this time, any question in relation to the application of this statute to other cases than those of water mills. If it were necessary, there might be room for reasonable doubts, if the statute admitted of so broad an application. But no point of that kind arises here.

It is very apparent that these parties engaged in no common enterprize for erecting a mill, to be carried by the power which each might find himself able to supply, on the days assigned for his use of it. The history of the mill, as stated in the answer, shows that they undertook to build a mill together, at their joint expense, to be owned in common, and that having several rights to the land, which they supposed subject to be flowed, they agreed to an appraisal of those lands, to be used afterwards as a common flowage for the mill. There is no indication that they expected the mill to be driven by hand, or by horses, or by steam; but it was evidently supposed it was to be put in motion by the Cochecho river, by means of the fall or mill privilege, which they supposed they had secured by their arrangements with each other. When the mill was erected and put in operation, it was found that, in order to operate it to the best advantage, it was necessary to raise the water to such a height that it overflowed a part of Watson's low meadow, high up on the river, and they were forced to pay him damages, and they continued to pay such damages till Watson sold to Peavey. But it does not appear that they ever made any contract with each other, or with Watson, on this subject, nor that the original contract or understanding was in any way changed by this unfortunate embar-

rassment. When the mill dam was swept away, the power relied upon to drive the mill was lost; it then became a question of rebuilding it, or of suffering the mill to be lost. Independent of the provisions of the statute, each had a right to judge for himself whether he would rebuild or not, as he would in the case of any other building, so that whatever might be the rule where parties had engaged in building a mill, upon an agreement or understanding that they were to hire the water necessary for its use, it seems very clear that that rule would not apply to the case of those who, from accident or miscalculation, have found themselves without the requisite moving power.

But the view thus urged upon us would not be sufficient for the purpose of the defendants, if it was well founded; because, in this case, the order to repair, made by the selectmen, is not confined to the repair of the mill, but extends to the repair of the dam and flume. If the mill were even required to be repaired, at any rate, whether there was water for it or not, we cannot imagine any justification which could be given for requiring an individual to rebuild a dam, which he had no lawful right to use, and which he could not use for the only purpose for which it is capable of being used, without subjecting himself to an action at law, and ultimately to an injunction from this court.

It is not readily to be supposed that the selectmen can have the right to compel a man to erect a dam, which must be, or which naturally will be, a nuisance to the land upon the stream above. Such a dam as has been heretofore used for this mill, it is very apparent from the case, must be a nuisance to the owner of the Watson land, as is admitted by the payment of damages by all these parties, or those whose estates they have, to Watson.

Assuming, as we think is clearly proved, that two feet of the upper part of the dam could not be used without flowing the Watson land, and that the plaintiff had no right to flow that land, several questions may be raised, bearing upon

the authority of the selectmen to make an order to·repair in such case.

And we think it clear that the selectmen had no power to order any repairs to be made, which will leave the mill, or mill dam, or flume substantially different from their previous form; as, for instance, to substitute a dam of six feet head and fall for one of eight feet. If this tribunal had such a jurisdiction as would enable them to make such an order as the exigency of each case might require, it seems evident that their order should require the plaintiff to repair so much of the dam as he has an interest in, and no more, which would be, in this case, to repair the dam to the height of six feet or thereabouts; and if other owners were interested in having the dam constructed of the height of eight feet, they might have been ordered to repair the residue of the dam to its original height. But the selectmen had no power to do this. Upon this point we have the authority of *Bellows* v. *Dewey*, 9 N. H. Rep. 278. There, was an order of the selectmen to the defendant to repair a dam; it was disregarded, and the plaintiff built a new dam, which was, at one extremity, seventy feet distant from the place of the old one. The court say, by *Parker*, C. J., " It is very evident that, under this statute (of 1801,) one party is not authorized to call upon the other to· erect a mill or dam in a different place, or of a different character from that already existing. Nor can he, upon the neglect of the other to repair, proceed to erect a mill, or dam, or flume, substantially different from the former, and compel the other to pay. A rebuilding may, perhaps, under some circumstances, be considered a repair within the meaning of the statute, but it cannot be extended beyond a substantial rebuilding. It does not authorize one party to erect a new mill or dam, varying substantially in its dimensions and situation, from the old." This case seems to us to have been decided upon the soundest principles, and it is conclusive against any power of selectmen to order a dam of six feet, or to require

a new privilege to be created by blasting the ledge or deepening the channel.

Being confined, then, to order the dam rebuilt of its original height, the question arises whether they had power to do this. And if we leave out of the question the lower six feet, the question is, if they had power to order the plaintiff to rebuild the two upper feet in height of the dam, was the plaintiff tenant in common of this proposed part of the dam, within the meaning of the statute? We think not. If the dam continued in being, so that the parties could be properly spoken of as tenants in common of it, in any sense, still they were not such, within the meaning of this statute. They were tenants in common of the structure, but they had no common interest in that which constituted its sole value, the right to use it for the purpose of raising the water to drive the mill. Peavey had an unqualified right to use the dam to its entire height, because it flowed no land which he had not a right to flow. Perhaps the other defendants may have the same right by contract with him. But this plaintiff has no right to make any use whatever of this part of the dam. He cannot raise the water upon it a single inch, without committing a nuisance to the land of Peavey, for which he must be liable in damages. Though these parties were, to some extent and for some purposes, tenants in common of this mill and its appurtenances, and probably so for the purpose of availing themselves generally of this statute, yet it is to be borne in mind that they were not tenants in common of the use of the mill. They did not share with each other the use or profit of the mill, and had no common interest in its use, because, as is shown by both the bill and answer, the use of the mill was divided into twenty-four equal parts or days, so that each owner had the sole and exclusive use of the mill one day in every twenty-four days for each share owned by him, so that this plaintiff could derive no benefit from the use of the entire dam by Peavey, on the days he was entitled to use it; and Peavey

would bear no part of the loss on the plaintiff's days of use. Now we think it clear that it could not have been the intention of the statute to subject persons to the burden of maintaining a dam, who, though tenants in common of the structure, had no common interest in its use, nor any right to use it all.

But if parties so interested were to be regarded as tenants in common for this purpose, still the order of the selectmen could not be supported. By the statute before quoted, the owners are required to make the necessary repairs, in proportion to their respective interests therein. Now it is apparent that the selectmen have apportioned the repairs they have ordered to be made among the mill owners, in proportion to their shares in the mill, as they should have done in case the owners had all possessed equal and similar rights in the property for each share in the mill, which is, we think, the only case in which selectmen can rightfully act under this statute. But, in this case, the interests of Peavey and the plaintiff in the dam ordered to be built, were not equal or similar for their respective shares. Peavey, as to the two upper feet of the dam, had the unqualified right to use the whole, at his pleasure, on the days of using the mill, while the plaintiff had no right to use it for a moment. If then, the other defendants had the same rights as Peavey, the whole costs of raising the dam to eight feet, above that of raising it six feet, should have been assessed to them, and no part of it to the plaintiff, for in that part they had the exclusive interest.

It can make no difference in our conclusions in this case, that one of the joint tenants, or tenants in common, of the mill, has acquired in severalty the right to the land required for the use of the mill or the right to restrain the other owners from raising the water to the height which is necessary to operate the mill. As to this property, at law, at least, his interest and his rights are entirely unconnected with theirs, and they have no control over him as to this property. Neither would

the court be justified in assuming that the relation of the parties in respect to the mill would afford any security to the plaintiff against the exercise of the power of the person who controlled the Watson meadow. Experience, perhaps, would rather justify the conclusion, that their chance of realizing something from such property would be better in the hands of strangers.

It is said that Peavey has always been willing to allow the other owners of the mill the privilege of flowing his lands in the usual manner, in their turns, for a reasonable equivalent, the same they have heretofore paid; and that he agreed to execute a permanent lease of that right to the plaintiff, and that it was not his fault that the lease was not executed. But we think no inference can be drawn, either from these facts or the professions in the bill, that the plaintiff will be allowed to exercise any but his legal rights. The plaintiff has no right to expect, after refusing to execute the lease and involving Peavey in this litigation, that he can ever acquire any right to this flowage.

The strongest equity exists between the owners of the mill, that neither of them should consult his own interest, by any purchase or speculation, at the expense of his fellows. And this principle is constantly applied in the case of copartners. Story Partn. 272.

Owners of mills, merely, as such, are not partners, but their position in regard to each other ought to place them under similar obligations of good faith and fair dealing to those of partners, and no man can fail to see the fairness and abstract justice there would be in holding, that any property in its nature indispensable for the use of a mill can be purchased by one, only for the common benefit of the owners, and that it would be just he should be held to convey it in just proportions to his fellows, at the price he paid for it. Van Horn v. Tonda, 5 Johns. ch. 407.

Without inquiring whether courts of equity have ever applied any such doctrine, in cases like the present, we are

satisfied that this view is a sufficient answer to the suggestion, that the plaintiff ought in equity to accept the lease he agreed to take of Peavey, and that he ought not to be heard to ask for equity until he does it, as well as to the further suggestion, that the plaintiff resists the repair of the Jones mill to increase the profits of his own. The first step adverse to the common interest seems to have been taken by Peavey himself.

It is suggested, in the defendants' argument, that the effect of a decree adverse to their right to rebuild this dam and repair the mill will be to deprive them, substantially, of their property, being the whole interest except the $\frac{9}{24}$ths owned by the plaintiff. That they have endeavored, by all reasonable offers, to satisfy the plaintiff either to go on with them, or to dispose of his interest to them, and that he refuses to do either; and that he ought not to be allowed to refuse to use his own rights or to allow them to enjoy theirs. And they urge that the plaintiff cannot be prejudiced by their being allowed to rebuild, agreeably to the order of the selectmen, because the statute gives them no remedy by suit for the money they may expend, but merely allows them the exclusive use of the property until he shall choose to repay them their money, with interest at the rate of 9 per cent.

At first look this has an air of plausibility, but it is substantially unsound. This may, perhaps, be more distinctly seen, if we suppose for a moment that the state of facts, attempted to be proved by the plaintiff, was clearly established, namely, that without flowing the Watson land there was no privilege at the Jones mill which could be used to any profit whatever. A mill might be used, but could not be profitable. If, under such circumstances, the court should sustain the order of the selectmen, and dismiss the bill, the effect would be to give to these defendants the entire interest in the mill. Without Peavey's consent the plaintiff cannot use his part to any profit. His money, if

he puts any there, must be without profit, and he must lose not only his share of the mill and flowage, but his money paid to rebuild the dam.   At that rate no man could be expected to advance his money or redeem his right, and the plaintiff's right, for which the defendants say he has been offered from two hundred twenty-five to two hundred seventy dollars, would be effectually transferred to the defendants for nothing.   To them it holds its full value, for they can use it, but he cannot.

The position that by a decree in favor of the plaintiff, the defendants must lose their interest, rests on the assumption that they have no remedy but by application to the selectmen, and if they cannot make such an order as is here relied upon, the defendants are without relief.   But we do not so understand the law.   This court has very broad equitable jurisdiction in relation to the concerns of joint tenants and tenants in common, and we understand it to be a part of the usual duty of courts of equity to decide upon and adjust the jarring claims of such cotenants.   1 Stor. Eq. Jur. § 505.   And we think it clear that in cases where selectmen are not authorized to act, this court has all necessary jurisdiction, and the powers to settle many questions which a tribunal of limited statutory powers would find it impossible to adjust.

Our conclusion, then, is, that where the owners of mills, as joint tenants, or tenants in common, or any of them, have lost the right to the water power necessary to operate them, whether the control of the water power is in the hands of one of their own number or of a stranger, the joint or common interest in the mill dam or mill, within the Revised Statutes, has ceased; there must in this case be a decree for the plaintiff.

Upon an intimation by the court that they would not deem it necessary to injoin the defendants from rebuilding the mill, if the defendant, Peavey, should execute and deliver to the clerk, for the use of the plaintiff, the leases set up in the

answer; this wàs done, and the fact set forth in a supple-
mentary answer, and a decree was entered up declaring the
order of the selectmen to be unauthorized and not binding
upon the plaintiff, and injoining the defendants to set up or
insist upon that order.